to the First Circuit today and to thank her for joining us. Thank you, Judge Montecalvo. Thank you, Judge. Today's cases will be called as previously announced and times will be as allotted to counsel. The first case today is 22-1276, United States v. Amanda Ford. At this time, would Attorney Siri Freed please introduce herself on the record to begin? Good morning, and may it please the Court. My name is Siri Freed, and I am appearing on behalf of the appellant, Amanda Ford. With the Court's permission, I would like to reserve one minute of my time for rebuttal. You may. Thank you very much. Your Honors, it is Ms. Ford's contention that the trial court abused its discretion in misapplying the Joint Undertaking Guideline 1B1.3 when it attributed responsibility to Ms. Ford for approximately 145 grams of fentanyl mixture that were found in the bedroom of the primary defendant in this conspiracy, Pedro Martinez. I mean, Pedro Baez, excuse me. The principles of sentencing liability in a conspiracy case differ from those of criminal liability for conspiracy. The settled law, not only in this circuit, but in other circuits, in applying 1B1.B in these drug conspiracy cases is that the court must find, at least by a preponderance of the evidence, the lower court must find that the specific defendant to whom drugs are being attributed entered into a joint undertaking with respect to those specific drugs that are being attributed to that defendant. In this case, Ms. Ford. In this case, the drugs that were found in Pedro Baez's bedroom. The problem with this case is that the facts as set out in the pre-sentence report just didn't support attributing those drugs to her on any kind of a foreseeability theory. The pre-sentence report writer attempted to hold her responsible on some theory that simply because she was Pedro Baez's live-in girlfriend, which was contested, that she therefore was responsible for anything that was going on in that house. There were trapped phone calls also where she was mentioned. She also did some specific runs for him. Well, she admitted responsibility to two specific transactions, which we're not taking issue with. I mean, we think that those are properly attributable to her. Those transactions, though, were a very, very small percentage of the amount of drugs that she was held responsible for, and that's what our problem is. The phone calls that the court mentions were not phone calls that were made by her. The government mentions these in their sentencing memo without putting these phone calls in the statement of offense conduct. Mentioned them only one day before the sentencing hearing, and she was not a party to those calls. There was a call made by Mr. Baez that mentioned her. There's no evidence in the pre-sentence report that whatever that transaction was, that it actually happened, that she actually participated in it, that she agreed to do something. The record is simply empty on this. Even in the government's brief, they do not characterize Ms. Ford as his live-in girlfriend. What was admitted was that she had lived there on and off. There's some frustrating things about this pre-sentence report because, for example, there's this allegation that she's arrested in her pajamas. There's simply no evidence of that at all. If I may, counsel. Yes, I'm sorry. If we take the PSR together with the sentencing memorandum, wouldn't you agree that the scope of her agreement was larger than the two controlled purchases? It may have been, but here's the problem. The pre-sentence report does not attempt to hold her responsible for some other unknown drug transactions that are quantified and that are reported in the pre-sentence report. For example, there is a concession that she, quote, unquote, had her own customer base and that she may have sold drugs to somebody. But here's the problem. We don't know. We have no idea what those drugs were. We don't know whether they were countable as fentanyl or cocaine or marijuana or some other drug that would be weighed differently under the sentencing guidelines. We have no idea what the quantity of those drugs were, and that's not what the pre-sentence report is holding her responsible for. Are you still proceeding on your Rule 30, that there was a violation of Rule 32 here? Well, I don't want to concede it. I do think that there was a violation, and I do think also that the cases that the government cites in its brief do not support the contention that this has to be reviewed under a plain error standard of review and that even if it were, it would survive plain error. It's obvious that the first two prongs are met here. First of all, that it was an obvious error that is in violation of settled law, yes. Yes. So by adopting the PSR, didn't the district judge implicitly resolve the disputed facts? I would say that this record does not show an implicit resolution of anything. It shows simply that he chose not to delve into what the contested facts were. But adopted the PSR without amendments. I'm sorry, say that again. That the district judge adopted the PSR without amendments. Well, no, all he said was that I think the guidelines are properly calculated. And in the Statement of Reasons, counsel? Well, in the Statement of Reasons, I believe the government says that he doesn't make any changes to the pre-sentence report. I do not think that this court can read into that an implicit adoption of all the contested facts. But even if the court attempted to do so, that in itself, or if the court did, let's say that the lower court did, where so much was contested and where there was no evidence offered by the government to support its view of what its side of what the contest was, that would be an abuse of discretion. If the court did that, that would be an abuse of discretion because there was too much that was important that was contested here that the government simply didn't offer any evidence on Judge Thompson. I guess what we're struggling with, I mean, the court, you're absolutely right, the court didn't say much. The court simply said, all right, thank you, all right, I'm not going to adjust the guidelines. Right. And left it at that. But we have some case law where we've affirmed the lower court on relatively few words in terms of our implicit analysis. Well, I think, I looked at some of those cases that the government cited in its brief, and there are a number of things about it that are, a number of those cases that are distinguishable. One is that in some of those cases, and I can't rattle off the names immediately, there were actually findings made by the judge at some point as opposed to just saying, well, I'm not going to adjust the guidelines. The judge later adopted findings, and one of those cases, I think it was Judge Young, made written findings later that adopted what was in contest. So this court was not in a position, this court on review, was not saying that there was a rule violation. This court was saying the findings were made and that was all that the court, the lower court needed to do in order to comply with the rule. Those findings were made. We don't have that here in this record. Another thing that I would want to point out about some of these cases that the government cited in its brief is that in many of those cases, those cases were up before this court on pure plain error review. That is, it wasn't just a Rule 32 case. In many of those cases that the government cited, I don't even really focus on the Rule 32 problem that I raise here. These were cases where simply no objections at all were made to the pre-sentence report, and this court was looking at whether or not on pure plain error review in the absence of any objections, the plain error hurdle threshold was crossed and the court decided that it was not. So you don't think Romero is on point because in Romero there were objections to the PSR, and the judge and this court decided that by stating on the record, the district judge, that he had read the PSR, the parties' sentencing memorandum, and listened to the arguments at sentencing hearing and adopting the PSR without change, it was enough to decide that the disputes were implicitly resolved. I think my response to that, Judge Karenio-Cole, would be to look at, I think it's the ghetto case. That is the case out of the Second Circuit where the Second Circuit vacated a sentence where at the court hearing the district court judge said, well, I think I'm satisfied about the scope of this defendant's participation in the conspiracy, but it was a question of whether or not he could be. I think this was the Boiler Room case. Yes. This was the Boiler Room case. And the Second Circuit said, just saying that there was conspiratorial liability here, which is what the government attempts to argue in its brief, satisfies the sentencing liability argument, which is really quite different and much narrower. Judge Montecalvo, may I have one last question? Oh, go ahead. So wouldn't you distinguish the ghetto case from this case? Because in the ghetto case the defendant was saddled with the total amount charged in the conspiracy. Well, was charged with the total amount, but the line that the government, and it's funny, in its brief the government makes these, I think in its sentencing memo as well. Maybe I'm really referring to the sentencing memo. Well, there was this 500 grams of cocaine that was mailed to the house, but we're not holding her responsible for that. And there was some other drugs that were sent to the downstairs apartment, but we're not holding her responsible for that. Without actually stating why, those drug transfers to the residence are distinguishable from this one, where there wasn't any evidence that she knew about those, Ms. Ford knew about those, just like there wasn't any evidence that she knew about the drugs that were found in Pedro Baez's bedroom, or had any, knew about them, knew that he was keeping them there, and agreed to help him distribute those drugs. So I do think it's, I don't think that that's a distinguishing characteristic with all due respect. I think that this is, it's sort of more of the same, frankly. I'm a little over my time. Thank you. Thank you very much. Thank you, counsel. At this time, Attorney Lockhart, please introduce yourself on the record to begin. Good morning. Donald Lockhart for the government, and may it please the court. Unless the panel has a different preference, I'll start with the Rule 32 procedural question and then move to the substantive clear error question. It's been suggested today, and in the reply brief, that somehow the fact that the defendant is relying on Rule 32 here makes this case different from this Court's decisions in Bedini, McCulloch, and Gonzalez, and Dino. And we take issue with that because if you look at the underlying nature of the claim, it's still, in each case, a failure to explain claim that should have been raised in the aftermath of the district court's actual ruling so that, as McCulloch says, the district court judge can then address it right then and there and, if necessary, expand on it and make subsidiary factual findings or articulate the analysis further. Mr. Lockhart, that puts a defense counsel in a very precarious situation because once they make their objection clear, you're saying that they have an obligation to somebody to call out the court's error by not addressing the very argument that they raised. Yes, and that is actually the central point of the McCulloch decision, in fact, which says that the mere fact that the defendant preserves the substantive claim to the hilt does not preserve the procedural claim about the district court's failure to explain the ruling. That is, at the very center of the McCulloch holding, this idea that you can preserve a substantive claim here concerning foreseeability and you can preserve it to the nth degree, but you have an obligation as a defense attorney to stand up in the wake of the judge's ruling and complain about the procedural error if you feel that the judge has not adequately explained that ruling. That is the central holding of McCulloch. It applies all force here. The only difference in this case is that the defendant is citing Rule 32 on appeal. We think that's a distinction without a difference for a couple reasons. One, the underlying claim is still the same. It concerns the failure of the judge to allegedly articulate the ruling. Second, however, if you look at this court's Rule 32H jurisprudence, which concerns the command that district court judges advise defendants prior to sentencing if they're going to upwardly vary, this court has applied the plain error standard in the Rule 32H context, even though that provision, like the one here, says that the judge must undertake a certain thing. Here it's resolve factual disputes. Do you agree he didn't make findings under Rule 32? I'm sorry, Your Honor? Do you agree he didn't make findings under Rule 32? No, I don't agree at all. So let's shift to the merits here. Assuming for the sake of argument that the claim is preserved, we're not even on plain error review, there's no error here at all under this court's longstanding set of precedents concerning implicit resolution. This court has said in the Romero case and many others that it's perfectly compatible with Rule 32 for a district court judge to render implicit findings of fact. And the case is on all fours with Romero in the sense that, just as in Romero, the district court took the bench here and said he had read both the initial and final PSRs, the parties' sentencing memoranda. Then there's a, as in Romero, a sentencing hearing at which these issues are fleshed out by the parties. And then the judge ultimately, in the statement of reasons, adopts the PSR without any change. Can we consider under Rule 32 the statement of reasons, so the post-sentencing reasons? I mean, what's the point of Rule 32 if we can sort of say we complied with it after the sentencing? Well, Rule 32 memorializes the fact that the judge has adopted the PSR without any changes, and it's in this case consistent with the judge's oral statement at sentencing to the effect that he would not make any changes in that context. And do you think when he said that he meant he adopts the original PSR or that- The final PSR. The final PSR. Yeah. It's important to note, I think, to flesh out some of these principles, the sequence of events that happens here. You have an initial PSR that comes out. It's loaded with facts. The defendant then disputes those facts, and on pages 28 through 29 of the sealed appendix, you see the portion of the PSR where the probation officer takes on those defense disputes, resolves all of them against the defendant, and then fast forward, you get to sentencing where there's a further opportunity to discuss all of these matters. The judge has said he's read the PSR, which would include those two pages, 28 and 29, in the sealed appendix. So the judge is telling us that having read all of that material, including the probation officer's specific sort of resolution of these factual disputes, that he is going with the probation officer's determination. And just to make it a little bit more concrete, we've heard today that there's no evidence that Amanda Ford was a regular person at this apartment, and there's even a dispute now for the first time in the reply brief, and now an argument that she was wearing pajamas when they went in on the search warrant. But those disputes were all resolved against her in the PSR. There was nothing mentioned at the sentencing hearing or in the opening brief about she wasn't in her pajamas. The reply brief says that that's a tidbit, the pajamas fact, that it's not significant. It's actually highly significant that she clearly spent the night there in an apartment with her boyfriend, as the defense concedes, the head of this operation, in an apartment that contains the 144 grams of heroin-fentanyl mix, and in the bedroom that's associated with Amanda Ford, the purse containing additional heroin-fentanyl mix. And the pajamas fact also goes to the broader, it supports more broadly the probation officer's determination that she was, in fact, a regular person staying at this apartment. And, again, these were facts resolved against her by probation. They weren't seriously contested orally at the sentencing hearing, and the judge was well within his rights to adopt the PSR without change. And if you look at the totality of those facts, including undisputed facts concerning undisputed calls that we referred to in our sentencing memo, it paints a picture of a woman who is not just the live-in girlfriend of the head of the operation, but she's out there working for this operation. The calls that you are referring to, were those in the government's summary of facts? There were two calls that we referred to only in our sentencing memoranda. Those two relate to two different things. One call indicates that Amanda Ford was sent out to deal heroin-fentanyl mix by Pedro Baez about three days before the search went down. The other call, the two other calls, reflect that she's conducting counter-surveillance around the apartment, and she's noticed a suspicious car. She's noticed a state trooper with a drug-stiffing dog going by, and she's monitoring a police scanner for police activity surrounding the apartment. Now, it's true that those two calls, that set of calls, was referred to only in our sentencing memo. But if you look at the sentencing hearing record, although you see the defense dispute, heavily dispute, our interpretation of different intercepted calls that we referred to the first time in our sentencing memorandum, there is no attempt whatsoever to push back on our interpretation of these specific calls that I've just referred to now. So we would submit that in addition to the facts that appear in the present report, including on pages 28 and 29 of the sealed appendix, you should include in your analysis also those undisputed calls that we referred to in our sentencing. So, counsel, you're saying that the government needs the information containing the sentencing memorandum to support the proposition that the scope of the agreement of Ms. Ford was bigger than the two control purchases? Not at all, Your Honor. So you don't need the sentencing memorandum? We do not need the facts in the sentencing memo to support, under a clear error review, the district court's foreseeability finding. That finding is amply supported, even without any consideration of those additional facts. And if the court would like, I can take off our main points in that regard, but they're all set out in the brief, and you can see I'm running short on time. So unless the court has further questions, we'll rest on our brief. Thank you. Thank you. Thank you, counsel. At this time, would Attorney Freed reintroduce herself on the record to begin? Thank you very much. I do appreciate it. Once again, it's Attorney Siri Freed, and there are just a couple of things I must address. Mr. Lockhart focused on this pajamas business. One of the things that I pointed out, and I thought that this was clear, is that in the statement of offense conduct, there's nothing about anybody wearing pajamas. It's not anywhere in the facts. The only place this pajama business comes up is in response to an objection that defense counsel, me, made to the pre-sentence report. It is something that the probation officer injected into the record in response to a pre-sentence report objection where there's no other documentary evidence to even suggest that that is true. Who knows where this information came from? But the pajamas are irrelevant. Well, I think they are. The pajamas are irrelevant if the government can show that Ms. Ford's agreement was to distribute fentanyl, heroin mixes for the bias, and not only for Pedro, for Anthony also. It was more than the two controlled purchases. It doesn't matter that she was living half of the time with the uncle and half of the time with the biases. But that would be, I don't disagree with that analysis at all, Your Honor, but the trouble is that the government is relying on those facts to try to prove her level of participation to show that that was part of the scope of her agreement. That is where the problem is. The pre-sentence report statement of offense conduct simply doesn't have the kinds of facts that the government needs to show that she, quote, unquote, ran the organization, which is one of the other allegations that was made and one of the other allegations that we specifically objected to in our sentencing memo, and that's at the record appendix at page 87, where that was specifically. My recollection is that you had a problem or the defense counsel had a problem below with the timing of the presentation of those additional facts. Very much so. Putting that aside, I don't recall that there was any specific objection to the facts that were in the supplemental statement presented by the government. Oh, well, there was, actually. I made a procedural objection during the sentencing hearing saying that the judge should not even look at those facts at all. I said notwithstanding the procedural objection. Oh, well, what I said was the problem was I was not in the position, I'm sorry, she's using the first person, I apologize, to determine whether those facts were actually accurate because they were sprung on the defense and on the court 24 hours before the sentencing hearing. But the government claims that documents were produced in discovery two and a half years before, which contained this information. Well, the trouble is in the conspiracy case, not all documents are relevant to all defendants, which is why we have a statement of offense conduct in the pre-sentence report that narrows down what conduct is relevant to what defendant. If the court's procedural order to submit a statement of relevant conduct to probation well in advance of the sentencing is to have any meaning at all for defense lawyers, especially in these wide-ranging, large conspiracies, I think there were, what, 27 or 19 or more than 20 defendants in this case who all had different roles, who all had different levels of participation, many of whom never even spoke to each other. But if that is to have any meaning, the government needs to be obliged to put in its statement of offense conduct the facts it's actually relying upon in order to attribute drug weight to a given defendant. It is not reasonable for any given defendant to be familiar with a 10,000-page factual record, 90% of which deals with different defendants, and then for the government to claim, because it neglected to put this in its statement of offense conduct, to say, well, you had this two years ago, why didn't you know it? When they didn't bother to put it in in the first place. Thank you. Thank you. I will rest my case there. Thank you very much.